Matter of Beeber (2024 NY Slip Op 04133)

Matter of Beeber

2024 NY Slip Op 04133

Decided on August 7, 2024

Appellate Division, Second Department

Per Curiam

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on August 7, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
COLLEEN D. DUFFY
BETSY BARROS
FRANCESCA E. CONNOLLY
DEBORAH A. DOWLING, JJ.

2022-01624

[*1]In the Matter of Paul Stephen Beeber, an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; Paul Stephen Beeber, respondent. (Attorney Registration No. 1511708)

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on April 10, 1970.

Catherine A. Sheridan, Hauppauge, NY, for petitioner.
Long Tuminello, LLP, Bay Shore, NY (Michelle Aulivola of counsel), for respondent.

PER CURIAM

OPINION & ORDER
The Grievance Committee for the Tenth Judicial District commenced a formal disciplinary proceeding against the respondent by serving and filing a notice of petition and a verified petition, both dated March 7, 2022. The respondent, through counsel, served and filed a verified answer dated March 28, 2022, admitting to some of the factual allegations, but denying any violation of the Rules of Professional Conduct. By decision and order on application dated May 19, 2022, this Court referred the matter to David I. Ferber, as Special Referee, to hear and report. By stipulation dated July 7, 2022, the charges were amended, and the respondent admitted to each factual specification alleged, as amended, but denied any violation of the Rules of Professional Conduct. A prehearing conference was conducted on July 19, 2022, during which counsel for the respondent indicated that the respondent intended to testify and would call three to four character witnesses. On September 13, 2022, the hearing proceeded with only the presence of the respondent's attorney and no explanation was provided for the respondent's absence. The respondent submitted five character reference letters as mitigation. In a report dated November 23, 2022, the Special Referee sustained all six charges in the petition. The Grievance Committee now moves to confirm the report of the Special Referee, and impose such discipline as this Court may deem just and proper. The respondent submits an amended affirmation in opposition to the Grievance Committee's motion to confirm and avers that because of his poor bookkeeping practices, he did not have the information sought by the Grievance Committee. Since all of the charges stemmed from this misconduct, the respondent argues that the charges are duplicative, and therefore, opposes the Grievance Committee's motion to the extent that it seeks to confirm duplicative charges.
The Petition and Answer 
The verified petition contains six charges concerning, inter alia, the respondent's failure to properly maintain his attorney trust accounts and his failure to cooperate with the Grievance Committee's investigation of two dishonored check reports from the Lawyers' Fund for [*2]Client Protection (hereinafter Lawyers' Fund).
Charge one, as amended, alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer by failing to account for funds maintained in his attorney trust account, in violation of rule 8.4(h) of the Rules of Professional Conduct (22 NYCRR 1200.0).
First Dishonored Check Report 
Between at least November 1, 2018, and July 30, 2019, the respondent maintained an attorney trust account at Chase Bank, titled "Paul Stephen Beeber Esquire Attorney Trust Account IOLA" with an account number ending in 1896 (hereinafter IOLA account 1896). By letter dated May 28, 2019 (hereinafter the May 28, 2019 letter), sent via first class mail to the respondent's business address registered with the Office of Court Administration, the Grievance Committee informed the respondent that a sua sponte investigation had been commenced against him based upon a dishonored check report from the Lawyers' Fund, which indicated that check number 8329, issued from IOLA account 1896, was dishonored. The May 28, 2019 letter requested that the respondent produce six months of bank and bookkeeping records for IOLA account 1896 and a written answer explaining the circumstances of the dishonored check within 20 days of receipt of the letter. The same letter warned that the respondent's unexcused failure to timely respond or cooperate with the Grievance Committee would constitute professional misconduct independent of the underlying investigation. The respondent failed to submit an answer or request additional time to do so. The respondent also failed to respond to the following correspondence sent by the Grievance Committee to the respondent's business address: (1) a letter dated June 18, 2019, sent via first class mail and certified mail, return receipt requested (hereinafter CMRRR), requesting that the respondent submit an answer within 10 days of his receipt of said letter; (2) a letter dated July 10, 2019, sent via CMRRR, directing the respondent to submit an answer within 10 days of receipt, together with an explanation of his failure to timely cooperate with the Grievance Committee's investigation; and (3) a letter dated August 8, 2019, sent via CMRRR, demanding that the respondent submit an answer within 10 days of receipt, together with an explanation of his failure to timely cooperate with the Grievance Committee's investigation, and warning that the Grievance Committee was authorized pursuant to 22 NYCRR 1240.9 to seek an immediate suspension of the respondent from the practice of law if he failed to cooperate with the disciplinary investigation.
On October 16, 2019, the respondent was personally served with a subpoena and subpoena duces tecum to appear at the Grievance Committee's office on October 29, 2019, with the previously requested bank and bookkeeping records.
On or about November 4, 2019, the respondent, through counsel, requested an extension to submit an answer.
By letter dated January 17, 2020, counsel for the respondent informed the Grievance Committee that the respondent "does not maintain a contemporaneous ledger with respect to the transactions performed on his escrow account nor does he have an organized method of bookkeeping with respect to same." By letter dated January 23, 2020 (hereinafter the January 23, 2020 letter), the Grievance Committee informed the respondent that his answer was late and deficient and specified the manner in which it was deficient. The January 23, 2020 letter further advised the respondent that a complete answer explaining the withdrawals made by the respondent from IOLA account 1896 was required within 10 days of receipt of the letter. The respondent did not respond to the January 23, 2020 letter or request additional time to do so.
By letter to the respondent's counsel dated February 11, 2020, sent via CMRRR, the Grievance Committee again requested that the respondent submit a complete answer within 10 days of receipt of said letter. The respondent submitted a letter dated February 25, 2020, indicating that he was still unable to provide the requested information concerning IOLA account 1896. On December 15, 2020, the respondent appeared for an examination under oath (hereinafter EUO) at the Grievance Committee's office. The respondent was asked about his IOLA account 1896 from November 2018 through April 2019. On November 1, 2018, IOLA account 1896 had an opening balance of $149,642.60. The respondent testified that he did not know the identities of the clients for whom he was holding funds in the account as of that date. The respondent also could not identify the client matters for the following four electronic fund transfers, totaling $11,200, that were made from IOLA account 1896 to the respondent's operating account: (1) $1,000 on November 7, 2018; (2) $6,000 on November 14, 2018; (3) $1,200 on November 16, 2018; and (4) $3,000 on November 21, 2018. Additionally, the respondent was unable to identify the client matters for the following three checks issued from IOLA account 1896: (1) check number 8276 in [*3]the sum of $298; (2) check number 8287 in the sum of $425.88; and (3) check number 8288 in the sum of $1,906. The respondent also made four electronic transfers on four separate dates totaling $6,500 from IOLA account 1896 to his operating account in connection with the respondent's representation of a seller in a real estate transaction who was identified as "Lavi." When asked to identify when the corresponding funds were deposited into IOLA account 1896, the respondent was unable to do so.
On December 1, 2018, IOLA account 1896 had an opening balance of $123,840.60. The respondent testified that he was unable to identify the clients for whom he was holding the funds in the account. In December 2018, the respondent made seven electronic transfers totaling $8,502 on six separate dates from IOLA account 1896 to his operating account. The respondent was unable to identify the client matters for these transfers, except a transfer of $2 that occurred on December 24, 2018. In December 2018, the respondent also issued nine checks totaling approximately $10,729 from IOLA account 1896. The respondent was able to identify the client matters for only five of the checks issued.
On January 1, 2019, the respondent's IOLA account 1896 had an opening balance of $112,359.05. The respondent testified that he could not identify the clients for whom he was holding the funds. In January 2019, the respondent electronically transferred a total of $20,500 from IOLA account 1896 to his operating account in eight transactions on eight separate dates. He was unable to identify the client matters for these disbursements.
On February 1, 2019, the respondent's IOLA account 1896 had an opening balance of $81,915.05. The respondent testified that he did not know the identities of the clients for whom he was holding the funds. In February 2019, the respondent electronically transferred a total of $16,250 from IOLA account 1896 to his operating account in six transactions on five separate dates. The respondent testified that he was unable to identify the client matters for these disbursements. On February 1, 2019, check number 8299 in the sum of $910.54 was drawn from the respondent's IOLA account 1896 in connection with the Estate of Brown. The respondent testified that he did not know the total sum he deposited into IOLA account 1896 for the Estate of Brown matter and did not know when he had deposited the funds for this client matter. On February 4, 2019, check number 8315 in the sum of $28,750 was drawn against funds in IOLA account 1896 for client Levine. The respondent testified that he did not know when corresponding funds for this client were deposited into IOLA account 1896.
On March 1, 2019, the respondent's IOLA account 1896 had an opening balance of $32,895.51. The respondent testified that he did not know the identity of the clients for whom he was holding the funds. In March 2019, the respondent electronically transferred a total of $17,000 from IOLA account 1896 to his operating account in eight transactions on seven separate dates. The respondent was unable to identify the client matters for these disbursements. In March 2019, check number 8319 in the sum of $2,100 and check number 8323 in the sum $1,000 for the Lavi matter were drawn against funds in IOLA account 1896. The respondent testified that he did not know the amount of funds on deposit in this account for the Lavi matter when these checks were paid.
On April 1, 2019, the respondent's IOLA account 1896 had an opening balance of $12,435.51. The respondent testified that he did not know the identity of the clients for whom he was holding the funds. In April 2019, the respondent electronically transferred a total of $7,100 from IOLA account 1896 to his operating account in three transactions on three separate dates. The respondent was unable to identify the client matters for these disbursements.
Second Dishonored Check Report 
Between at least July 2019 and December 2019, the respondent maintained another trust account at Chase Bank, titled "Paul Stephen Beeber Attorney Trust Account IOLA" with account number ending in 7076 (hereinafter IOLA account 7076). By letter dated February 21, 2020 (hereinafter the February 21, 2020 letter), sent via first class mail to the respondent's business address, the Grievance Committee informed the respondent that a sua sponte investigation had been commenced against him based upon a dishonored check report from the Lawyers' Fund indicating that check number 1022 in the sum of $2,110 was dishonored from IOLA account 7076. The February 21, 2020 letter requested that the respondent produce six months of bank and bookkeeping records for IOLA account 7076 and an affidavit explaining the circumstances of the dishonored check within 20 days of his receipt of the letter. The same letter also warned the respondent that his unexcused failure to timely respond or cooperate with the Grievance Committee constituted professional misconduct independent of the underlying investigation.
In response, the respondent submitted an affidavit dated December 15, 2020, swearing, inter alia, that IOLA account 1896 had been subjected to "an elaborate fraud," which resulted in a loss of $100,000, but that Chase Bank had recovered $80,000 of the depleted funds.
By letter to the respondent's counsel dated December 31, 2020 (hereinafter the December 31, 2020 letter), the Grievance Committee again directed the respondent to provide his bank and bookkeeping records for IOLA account 7076 and an affidavit explaining the circumstances of the $2,110 dishonored check. The respondent was also asked to indicate the source of funds for the opening balance of $53,934 for this account on August 1, 2019. In addition, the respondent was directed to identify the clients whose funds were impacted by the alleged fraud. The respondent was directed to submit the requested information by January 8, 2021, and he failed to do so.
On March 23, 2021, the respondent appeared at the Grievance Committee's office for a second EUO. He was asked to provide the information requested in the December 31, 2020 letter, and he failed to do so. At the second EUO, the respondent was asked to provide the previously requested information and additional information within two weeks of the second EUO. The additional information sought included monthly bank statements for IOLA account 7076, additional bank statements for IOLA account 1896, an accounting for the funds held in trust for the "Lescius" and "Lavi" matters, and banking and bookkeeping information for the respondent's bank account at Capital One Bank.
By letter dated March 29, 2021, the Grievance Committee informed the respondent that the documents and information previously requested were due on or before April 6, 2021. The respondent failed to submit the requested documents and information or otherwise request additional time to do so.
By further correspondence dated April 30, 2021, May 10, 2021, and June 16, 2021, the Grievance Committee informed the respondent that his production of the requested information and documents was outstanding. The respondent failed to submit the requested documents and information or otherwise request additional time to do so.
Charge two alleges that the respondent engaged in conduct prejudicial to the administration of justice by failing to cooperate with the Grievance Committee's lawful demands as described in charge one, in violation of rule 8.4(d) of the Rules of Professional Conduct.
Charge three alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer by disbursing funds from his trust accounts when no corresponding funds were on deposit, in violation of rule 8.4(h) of the Rules of Professional Conduct. In addition to the factual allegations set forth in charge one, on or about July 23, 2019, IOLA account 7076 was opened with a zero balance. On October 11, 2019, check number 1004 in the sum of $40,000 payable to "Tracy Lescius and Francis Lescius Trustees and Griselda Lescius Special Needs Trust" was paid from IOLA account 7076 when there were no corresponding funds on deposit.
Charge four alleges that the respondent failed to maintain required bookkeeping records for his trust account as described in charge one, in violation of rule 1.15(d)(1)(i) of the Rules of Professional Conduct.
Charge five alleges that the respondent failed to produce all requested bookkeeping records in connection with a disciplinary investigation as described in charge one, in violation of rule 1.15(i) of the Rules of Professional Conduct.
Charge six alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer as alleged in charges one through five, in violation of rule 8.4(h) of the Rules of Professional Conduct.
In his verified answer, the respondent admitted to the factual allegations set forth in the verified petition, but denied any violation of the Rules of Professional Conduct. Nevertheless, the respondent submitted, in mitigation, that he "accepts responsibility and is sincerely remorseful for his actions," and acted "without fraudulent, malicious or venal intent." The respondent asserted that he was a victim of a fraudulent scheme resulting in unauthorized electronic deductions from IOLA account 1896 without his knowledge or consent. Upon discovery of the unauthorized deductions, the respondent immediately ceased the use of IOLA account 1896, opened a new trust account "to ensure the preservation of funds entrusted to him," and commenced litigation in an effort to recover the fraudulently deducted funds. The respondent also stated that during the relevant period for which the Grievance Committee was requesting documents and information, he had suffered an injury and was participating in physical therapy. Furthermore, the respondent contended that his failure to cooperate with the demands of the Grievance Committee was due to his "poor [*4]bookkeeping practices" rather than an intentional refusal to cooperate.
The Hearing Record 
The hearing record provides additional information from the respondent concerning this fraudulent scheme. In June 2019, the respondent received a telephone call from someone purportedly from Microsoft, who claimed that their division was going out of business and stating that they would return $300 to the respondent if he provided his bank account information. The respondent agreed to do so, even though he did not have an account with Microsoft and was not paying fees. The caller called again to inform the respondent that $6,300 inadvertently had been wired to the respondent's bank account instead, and asked the respondent to return $6,000 to a person named Amber Brothenson by wire transfer to her TD Bank account. The respondent avered that he checked his operating account and "the funds seemed to be there," so he wired the funds to Brothenson at TD Bank. Thereafter, the respondent was informed that "they" detected malware on the respondent's bank account and that additional funds were being deposited into his operating account. "They" instructed the respondent to transfer those funds back to them as well. According to the respondent's affidavit, "they" took control of his operating and escrow accounts and transferred funds from his escrow account into his operating account, causing a depletion of $100,000 from IOLA account 1896. The respondent stated that his online banking showed that IOLA acocunt 1896 had a balance of $184,000, when the balance was only $84,000. The respondent further stated that in July 2019, he went to the bank in person, discovered the true balance of the IOLA account 1896, and realized that he was a victim of "an elaborate fraud." These events occurred between June 25, 2019, and July 11, 2019. The respondent immediately closed IOLA account 1896 and notified the police. Chase Bank recovered approximately $80,000 for the respondent, but was unable to recover $20,000 sent to TD Bank. On or about March 2020, the respondent sued TD Bank and settled the matter for $7,000. At the time of his second EUO, the respondent still had at least a $13,000 shortfall in his IOLA account.
According to the bank statements, the multiple wire transfers from IOLA account 1896 to the respondent's operating account that are charged in the petition predate the period when the respondent was defrauded. The transactions that are the subject of the petition occurred between November 2018 and April 2019. During that six-month period, the respondent made 35 transfers totaling $80,552 from IOLA account 1896 to his operating account. The fraudulent transactions did not occur until June 25, 2019. Upon discovering that he was a victim of fraud, the respondent purportedly closed IOLA account 1896 and opened IOLA account 7076. The bank statements show that between October 2019 and February 2020, after the fraud had occurred and the respondent already was under a grievance investigation, he wired funds totaling $59,348 in 39 transactions from IOLA account 7076 to his personal accounts ending in 5036 and 8955, without keeping proper records.
At his EUO, the respondent was asked about the transactions in IOLA account 1896. The respondent generally was unable or unwilling to provide any information, including the identities of the clients and/or what type of legal work he performed for the transactions in question, or the purpose of the first dishonored check. The respondent was asked about a check in the sum of $10,000 from Thomas Skoblicki that was deposited into the IOLA account 1896 on November 2, 2018. While the respondent claimed that the $10,000 was a down payment, he could not recall if he represented Skoblicki or someone else in the transaction. The respondent further testified that he was unaware that the Grievance Committee wanted this type of information. Regarding an electronic transfer of $1,000 from IOLA account 1896 to his operating account on November 2, 2018, the respondent initially testified that this transfer related to the Skoblicki matter and that the respondent presumed it was for his fees. When questioned why he was withdrawing fees on the same day that the down payment was deposited, the respondent changed his testimony and stated that he did not know the client matter related to the $1,000 transfer. Four additional wire transfers totaling $6,500 were made between November 21, 2018, and November 30, 2018, which the respondent testified were related to client Lavi for the sale of a property in Plainview for approximately $1 million. According to the respondent, he was holding more than $500,000 pursuant to an agreement that he had in his office, but he did not remember when he deposited the funds into IOLA account 1896. Again, the respondent testified that he was unaware that the Grievance Committee wanted this information. The respondent testified that for being the escrow agent, he was entitled to $30,000 in fees and that he had supporting documentation. After the EUO, the Grievance Committee requested that the respondent provide more information concerning the [*5]transactions in IOLA account 1896, but he failed to meaningfully comply.
The respondent's bank records also indicate that his IOLA accounts had other instances of fraudulent or suspicious activity. At his second EUO, the respondent admitted that "because of all this machinations that occurred," Chase Bank had closed his accounts and he had opened a new escrow account at Capital One bank.
In three of the five character reference letters that the respondent submitted in mitigation, the authors wrote of the respondent's active involvement in the Glen Cove Rotary Club (hereinafter the rotary club). According to the respondent's bank statements, a check in the sum of $5,000 from the rotary club, dated April 25, 2019, was deposited into IOLA account 1896. However, approximately one month later, a check in the sum of $5,100 was issued by the respondent back to the rotary club, which the respondent denoted as a "reimbursement." At his EUO, the respondent was asked about this transaction and the client matter to which it related. The respondent testified, "I cannot say."
Findings and Conclusions 
In view of the evidence adduced, we find that the Special Referee properly sustained all six charges and that they were not duplicative. Accordingly, the Grievance Committee's motion to confirm the Special Referee's report is granted. In determining an appropriate measure of discipline, we have considered in mitigation, inter alia, the respondent's charitable and pro bono activities, and his character letters. The respondent contends that he is 77 years old, and because he is not computer savvy, he failed to maintain proper bookkeeping records. The respondent argues, in essence, that he did not have the records sought by the Grievance Committee and did not intentionally fail to cooperate with its investigation. We find the respondent's explanation for his failure to cooperate with the Grievance Committee and to maintain proper bookkeeping records without merit. For example, by letter dated January 7, 2020, counsel for the respondent informed the Grievance Committee that the respondent had "note[d] client funds transactions within the individual client files," but then refused to produce those files. The Grievance Committee asked the respondent to produce bank statements, which should be readily available, and he failed to do so. In the midst of an investigation by the Grievance Committee and after he discovered that he was a victim of fraud, the respondent opened IOLA account 7076 and continued his failure to uphold his fiduciary duty to properly maintain bookkeeping records for this escrow account and to preserve client and/or third-party funds. In further aggravation, the respondent's disciplinary history consists of two Admonitions and one Letter of Advisement. The respondent's failure to cooperate with the Grievance Committee's investigation and his failure to appear at his hearing also demonstrate his disregard of the disciplinary process and his ethical duties, which we find egregious.
Under the totality of the circumstances, we find that disbarment is warranted.
DILLON, J.P., DUFFY, BARROS, CONNOLLY and DOWLING, JJ., concur
ORDERED that the Grievance Committee's motion to confirm the Special Referee's
report is granted; and it is further,
ORDERED that the respondent, Paul Stephen Beeber, is disbarred, effective immediately, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, Paul Stephen Beeber, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Paul Stephen Beeber, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Paul Stephen Beeber, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the [*6]respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court